And the first matter we have today is 24-2080, United States v. Ulibarri, and if I've mispronounced that, please correct me. May it please the court, I am Ryan Truskoski and I represent the defendant Manuel Ulibarri. So we've got a lot going on in this one, at least for a motion to suppress. I will start off with the reason for the traffic stop, which is the allegedly loud muffler. And really our whole theme in this case, and for every facet of this case, is going to be that what occurred was a pretext for a search. Everything was pretextual. So he's pulled over for having an allegedly loud muffler. Well, his own mother said it was unusually loud, didn't she? Well, that's part of it. I mean, you know, we're aware that the district court found that the officers maybe even had a reasonable mistake on this, or maybe they had a reasonable suspicion. But there's really... Or probable cause. I think the district court found both, didn't it? It found both, correct. But we're arguing that there was no probable cause because there was never a muffler violation. There was no proof of that, no finding of that. So in order to pull him over, we're talking about the stop here, right? Correct. In order to pull him over, do they have to have proof, or do they just have to have a reasonable suspicion? A reasonable suspicion is the alternative, but we are arguing that they were not being reasonable. You know, we have no audio video footage of the stop. There's no evidence of how loud the actual sound was, no decibels. It's just all very subjective. You know, for a stop, we're arguing that there's got to be some objective criteria. So, you know, he was never cited for a muffler violation, and, you know, we're arguing that's proof of pretext. You know, there was no proof the muffler was not in its original state. Well, you don't have to. Under the ordinance, all you have to do is have, it's a violation if the muffler is not in good working order and in constant operation to prevent excessive and unusual noise. It doesn't have to be modified, it just has to be not well maintained. That is part of it, too, yes. So we're just arguing it's just too subjective for those findings. Okay, so if maybe we disagree with you and we think the stop was legitimate, why don't we move on? Sure. So the next major issue, of course, is the impoundment. So under Opperman, the court knows that really the standard is, was the vehicle impeding traffic or threatening public safety or convenience? So we're arguing it was not. The car was not obstructing traffic or presenting a safety hazard. It wasn't on the street, did not block the flow of traffic, you know, and the threat to public safety must be imminent and that's the Woodard case. Opperman is the seminal case here and Opperman certainly didn't, you know, it didn't involve anything much different than this case. And in that case, you know, the court said that as long as it violates parking ordinances, which is what we have here, it thereby, thereby jeopardizes public safety and the efficient movement in vehicular traffic. In Opperman, the defendant's vehicle was parked in a zone overnight that you weren't supposed to park in and it was still there, it was ticketed, and it was still there at ten o'clock in the morning when it was no longer impermissible and they still said it was okay at ten o'clock in the morning to impound it. How is this different? Well, what more do we need here? Because of our other facts. We also had a gun in this car. Gun hidden out of view. But in the car in a high-crime area and the officers know it's there because he's admitted it's there. Correct. So Opperman is close. We're arguing that our other factors make a difference. The fact that it was not going to be there very long. Close. Why is Opperman close? Why isn't this even stronger than Opperman? Because of our ancillary facts. The car would not have been there long. The defendant would have bonded it out and got it right away or the mother would have gotten it right away. Well, he wasn't going to be allowed to bond out right away and they weren't going to allow the mother. She wasn't there so they went ahead and called and impounded it. They don't have to let the mother come and they don't have to wait for mom to come. Well, I disagree with that point because under Sanders Factor 3 the says is, you know, if there's an alternative to impoundment, especially if there's another driver available to take the car. There was no driver on the scene. He had to call his mother who they didn't know if she had a valid ID or if when she got there she was somebody who was able to get in a car that had a loaded weapon in it. That's not a person on the scene. That's not another driver that's readily available that they can check. Plus, the officer said this car was ridiculously loud as even mom recognized and that's another reason not to let them drive it. We're arguing that the police had an affirmative duty to inquire about the circumstances of the mother, whether she was close by, whether she was capable of driving and really... Well, how is this different than a broken taillight? I mean, you've got a muffler that's out of compliance and if you drive it you're in violation of the traffic laws. So, nobody can drive it, can they? Yes, because the police are not towing cars for broken taillights and in this car, in this case, they're not towing cars for imperfect parking jobs. Well, so I'm not talking about the parking job right now. I'm talking about an illegal muffler. A muffler that that is excessively loud. Okay, I see what you're saying. If everything went smoothly here and he was just cited for a bad muffler, the police wouldn't let him go. They would not, they wouldn't tow the car. Well, except for he had two outstanding wants. True, but just in a vacuum, police let people drive away after tickets with a headlight out, for example. Is that discretionary? I'm not, I would, I'm sure there's criteria for their impoundment, but as the District Court even found in this case, it's a slippery slope of whether you're going to be impounding people for imperfect parking jobs or very small, you know, civil infractions. I'm not sure what the exact guidelines are on that, but I'm sure courts are not going to be, you know, allow a free-for-all for impoundments that really are just going to be ruses for searches. And Your Honor brought up the firearm aspect to this case. So we're, we're going to be arguing, we are arguing that, you know, the so-called, so-called firearms exception no longer exists under the Second Amendment, you know. I don't think this has anything to do with the Second Amendment. This has to do with whether, whether the impoundment was reasonable. And the firearm added another safety, another level of safety issue to the mix, is all I'm saying. Okay. I don't understand your Second Amendment argument at all. I'm not suggesting he didn't have a firearm in the vehicle. It's just, I'm just talking about whether the impoundment was reasonable. I just, with regard to the comment, I believe that the firearm is completely irrelevant based on our Second Amendment arguments. Well, but the, we have case law that says that's not true. I'm just saying it. You're saying that somehow the Second Amendment, which was in existence when we decided these cases, has now overruled our cases? It's a new world order now after Bruin, Rahimi, and their progeny. It's ever-evolving, daily, that the Second Amendment. I would agree it's ever-evolving, daily. Right. That, you know, there's no more need to secure firearms exceptions in cars. That now, under this new case law, the car is now going to be treated the same as a home. And really, the underlying logic for all that. What case law do you rely on? Can you give me your best case that a car is treated the same as a home for Fourth Amendment purposes? This is all brand new. We're hoping it starts here. Okay, so you have no case law, but you're, you're arguing that we should now say that cars should be treated the same as homes under the Fourth Amendment because of the Second Amendment. Yes. Yes. So this is, you know, brand new territory, occurring almost daily, and really, you know, the possibility that the basic of the, the basis of the old case law was that the hypothetical that a vandal may break into the car and take the gun. But we're arguing that's constitutionally irrelevant now, and that. What in Bruin suggests that it's constitutionally irrelevant from a community caretaking standpoint for the police to be concerned about an unsecured firearm in an abandoned car? If it's that. One second. It's still a concern, but the Second Amendment of a car owner trumps it. So that, you know, they always, they're going back to the historical times now. Could you keep a gun in your stagecoach on your horse? And you could. So that's how you. We're not talking about whether he could keep the gun in the car. That's not the issue in this case. His possession of the gun, his right to have a gun, not the issue here. I'm just saying it should not be part of the calculus for the impoundment question. So I'll reserve the rest of the time for my rebuttal. What about the inventory search? Can you talk about that at all? Sure. So, you know, the inventory search was, you know, not done according to the required standardized criteria. So it's not valid. You know, it was so inefficient that it was pretextual. You know, as the district court found, there was no contemporaneous itemization of the contents of the car, no detailed inventory list. It just was not good faith. There was no need to protect anything in the car. There was nothing valuable in plain view. What do you do with Bertine from the Supreme Court that approved a pretty, as they called, slipshod inventory search that, like this one, didn't catalog cash found in the vehicle? Yeah, I don't remember the exact facts of that case, but there was just so much here that wasn't cataloged. I can go through it. Cash and just all the other things. And, you know, it was just so, woefully done that we're arguing that it was just a ruse for a search. Thank you. Good morning, Your Honors. May it please the Court, Tiffany Walters for the United States. The Fourth Amendment permits reasonable impoundments of vehicles as part of law enforcement's community caretaking duties. Opperman tells us that impoundments are reasonable when a vehicle impedes traffic or threatens public safety or convenience. This one didn't impede traffic, did it? It didn't impede traffic. It was more of a public convenience type case. So while there was no immediate threat to public convenience, had it been left there, it was blocking two parking stalls and it was on a metered street in downtown Albuquerque. Eventually, just like the car in Opperman, it would have blocked spots that other cars may have parked in. And officers were able to address that situation before waiting for the inconvenience to happen. Just like in Opperman, there's no evidence on the record that there are cars circling at that moment and needing that parking spot. Officers can anticipate that this individual is being arrested, may not be back to this car for some time, and address it by impounding the car. Didn't they have an obligation to contact Mr. Olibari's mother to drive the car away? I'm sorry. They did not have an obligation to contact her where she was not present and where the car was not immediately operable. So we have the muffler violation, which would have prevented her from driving the car away anyway. But then also, she's not on the scene, as Your Honor mentioned. Well, the person to drive it away is almost never on the scene, and yet we have case law that suggests there's an obligation to make an effort. Well, I think when you look at the cases that do find an obligation to make an effort, they're very fact specific. Thinking of Ramos, which is a case where, similar to this, this court found that there was an obligation to contact mom. But there, it was different in that we were talking about a very small town where the officers know mom. Know mom lives just down the street, essentially, and could be there in a matter of minutes. Here, we're in Albuquerque, where we don't know the mother. We don't know when she will be there. We don't know if she will show up. The officers testified that they had done this in situations where the individual who showed up was incapable of driving the car because they were intoxicated or didn't have a license. So there's not an obligation for the officers to reach out and wait around to see if mom will show up at 1130 at night to take the car. And Ramos was the car on private property? I mean, that's the other piece here, is that we are on public property. And in private property cases, there's sort of a presumption against her. That's a factor in terms of leaning against the reasonableness of impoundment. But here, we're on public property. Ramos, the car could have just been left in this, I believe it was like a convenience store parking lot, for a period of time until mom showed up. So the officers wouldn't have to necessarily wait around for her. But here, we're on a street in downtown Albuquerque, in the middle of the night, in a high crime area, in a car. The testimony from mom was she lived closer than the towing company and could actually get there faster, if I'm remembering. In Ramos. Isn't that this one too? I don't believe that's the case here. I think there's not clear evidence as to where the towing company is or where mom lives in this case. But that was the case in Ramos. Now, she did ultimately show up on the scene, but that was after officers had already made the decision to arrest and to impound. They'd searched the car. At that point, the inventory search had been completed. She came after the inventory search was completed? Yes. Yes. As they're putting on the tow truck, right? The tow truck is pulling up. They're saying, watch out for the tow truck. So at that point, the gun, the drugs have already been discovered. Even if they were able to cancel the tow or something, it wouldn't have changed anything about the outcome of this case. What about driving away? Is there any evidence in the record that indicates that it is impossible to drive this vehicle without the excessive noise? I don't know that the evidence goes as far as to say it's impossible, but the officers did testify it would create an ongoing nuisance, given the excessive noise that this vehicle was creating. What about the district court? I'm sorry, Your Honor. Could you repeat? Did the district court rely upon that? Did the district court rely on that? The district court did find that it couldn't be driven away. Yes. I think that's in the findings of facts. Yes. What about the argument that police routinely let people drive away with a broken taillight or with some minor coordinates violation, even though it is technically still violating that? I don't believe Mr. Labarge cited anything in the record to support that, although that may be the case. I point to Kendall, where there was a broken taillight, and this court found that the vehicle was inoperable and couldn't be driven away because of that. And here, the officers are able to make the determination that this muffler is so loud that they can hear it blocks away. It's driving around in the middle of night in downtown Albuquerque. And this is not a situation where they want to have mom come and get the car and continue to drive it in the state. What about the rather surprising lack of detail in the inventory search? It was, I mean, it was beyond slipshod. Correct. The paperwork was not properly completed as far as the inventory search. But here we do have other factors that weigh in favor of the reasonableness of the inventory search. How reasonable can it be to leave off $10,000 in cash in an inventory search? If there's one thing that you would think you would want to itemize, it would be $10,000 in cash. That's a fair point. There's a statement on the cameras where the officers are saying they want to count this under the cameras. I don't know why that would preclude it being counted. Do you know if they did count it under the cameras? There is, I think it's in Exhibit 13, that video. They show them taking the cash back to the police station. It's at the police station. It's on the table. It's in a plastic bag. That's in the record? That's in the video, yes, which is in the record. I'm sorry, it's in the video that was taken at the station? It's a lapel camera video. So one of the officers had the lapel camera running from the time of the stop all the way until when he went back to the station. And that's them counting the cash is part of the record? I'm sorry. I don't think you can see them counting it. Because I think another individual besides the officer who was wearing the lapel counted it. But you see it on the counter in a plastic bag, yes, in Exhibit 13. It's Officer Herbst's lapel camera. So we don't have any suggestion that there's anything funny going on here. Certainly it should be. They also didn't note that they found a controlled substance. I mean, they didn't note the drugs that were found in it. Correct. I mean, certainly. That's also odd. Yes. I think it's fair to criticize. Perhaps unreasonable. Correct. How do you compare this case to the Supreme Court case? I'm trying to remember the name.   So similarly. I get that there was cash. I think it was $1,000. And that was back in the early 80s. Correct. But I don't think that equates to $10,000 and narcotics. It's not the same. Perhaps it's not directly equivalent. But it's similar in many ways. And then when we look at the timing, the officers have completed the inventory search by the time they fill out this paperwork. Should they have filled out the paperwork better? Of course. But at the same time, they've already found the different evidence, the guns, the drugs, at the time that they then later complete the form. So whether you want to look at it in terms of a causal relationship or inevitable discovery, had they completed that form correctly, it wouldn't have changed anything. That same evidence would have been found by the officers. And we also do know that it was consistent with Albuquerque Police standard operating procedures that if they impound, they have to inventory. There's no discretion there. And this type of search was within the scope of an inventory search. So it was looking through the car, including any closed containers that could be safely opened. It was consistent with that. And they did complete some paperwork, although, as the court noted, incompletely. Well, from early on, one of the officers indicated at least a partial investigatory motive. He said that it wasn't going to take him to just bond out because I think he has something. I think there is something. I mean, how does that influence the review of the search here? I believe that that statement is in reference to the decision to arrest. And Wren tells us that a decision to arrest is valid as long as it's supported by a probable cause, regardless of whether or not there's some other subjective motive. Well, it's not just to arrest because it's, you know, a house of cards. The arrest leads to the impoundment. The impoundment leads to the inventory source. So if you have a motive that is investigatory, it's relevant at every stage of that, isn't it? It can be. But also, the question is whether or not the investigatory motive is the sole motive for the impoundment and search under Bertin. And so we have Trujillo, which tells us when you have dual motives, that does not invalidate an otherwise reasonable impoundment and inventory search. And here, it's clear on the record that there were, at a minimum, dual motives. So as far as the stop, I know Mr. Ulibarri has argued that it's pretextual, but as soon as they come up to the car, they're talking about the muffler. There's no reason that the stop was pretextual. They have the arrest warrants. They decide to arrest on those warrants. But at the same time, once they do that, there's really no other viable option with the car. They're left to impound the car. They have to call mom. Yeah. Well. Take a little more time and call mom. There's nothing. See how long it's going to take mom to get there and if she's got a valid driver's license. But then we still have the muffler problem, that mom can't drive away the car with the loud muffler. So here. And the district court made that finding. Correct. Right. And so also under Bertin, we're looking at whether the choice the officers made were reasonable. Maybe it would have also been reasonable for the officers to wait around for some period of time. But the question is not whether or not there might have been any possible alternative. It's just whether the choice that was made here was reasonable. Well, they also, under Bertin, the question is whether they might have acted in bad faith or for the sole purpose of the investigation. For the sole purpose. And even if we say it was a mixed motive. Is there evidence of bad faith here? I don't think. I mean, to be able to justify, you know, not bothering to itemize $10,000 in cash and drugs found in a car. Well. Seems that they were interested in something, but. They, again, that post-states, or is post-temporally to the actual search. And here there's evidence on the record that, on the video cameras, that as they're impounding the car, they're telling him that we have to inventory it. Because that's required. And so it's a chain that once the impoundment is set in motion, they have no choice but to inventory. And the inventory search is going to uncover that evidence no matter what. So I don't think that there can be, there's any evidence in the record that the motive to see what something they might have is the sole motive for the search in this case. And that's what would be required to invalidate it under Bertin. In addition. Looks like Judge Murphy has a question. Oh, I'm sorry. You try to justify the absence of the inventory and the cash by indicating the evidence shows it was outside the vehicle anyway. What about the drugs? Is there any similar evidence that they, too, were outside the vehicle and for that reason were not inventory? No. The drugs were found in the backpack in the backseat of the car, which is actually where the cash was found as well. So the cash and the drugs were inside the car. The only comment I was making about the cash was that on the video it does indicate that they plan to count it under the cameras. I'm not sure if that's why it didn't end up on the inventory or not. But that is something that appears on the record that might explain it. But there's no similar evidence regarding the drugs? No, there's not. There's a mention of paraphernalia in the inventory report, but obviously that's general and not specific. And then the two firearms are listed in the inventory as well. The officers got lucky here that when they pulled him over, he happened to have his back tires in a different parking space or just over the parking space. Is that true? I mean, had they not had that, would there have been a basis to impound the vehicle? I think there still would be. I think that's an additional factor that helps.  Well, it would still be parked in a metered parking spot. And if he's arrested and kept for an indeterminate period of time, he can't just leave it in a metered parking spot in downtown Albuquerque. So it would be still similar to operating. Right. And then we still have the same factors of the firearm and the mom not being there and the muffler. So all of that still goes into play. When do they have an obligation to call when you're saying, hey, call my mom, come get it? When, if ever, do the officers have an obligation to make an effort? Because we certainly have case law that talks about making an effort.  I think all of those case law that I can think of where they're required to make that effort, first, the vehicle is on private property. So there's nothing to say that it can't just be left there for some period of time while things are worked out with mom. Officers aren't going to be required to just stick around on the scene. So we have Ramos. I think Sanders was another case or Woodard where there could have been some efforts made to contact. But in none of those cases were we on public property. And we don't have, again, we have the gun issue here, which I think distinguishes it. And it both helps justify the impoundment under Opperman. But it also is a standalone reason for the search under Dombrowski. Well, but the gun, to me, seems irrelevant whether his mother can come pick up the car. I mean, the gun is a problem if you leave the car on a public street where any random person could come and get the gun. But if mom's going to come take the gun home and put it in the gun safe at home, why is that an issue? As long as mom is able to possess the gun, there's no barrier. That wouldn't be a problem. But here the gun is really the problem because it's going to, the alternative is to leave it here. I mean, unless mom's a felon. Right. Right. And we don't have. She pretty much could take the gun. Correct. Correct. I think the gun is really the problem with leaving it here in a high crime area. Not only is there a firearm, but there's visible bullets strewn in the backseat. Those would have been visible to any passerby. And that presents a direct threat to public safety as Dombrowski recognized. If you leave it there. If you leave it there. Correct. But here, I think this is very distinguishable in that there's no, I mean, mom is not there on the scene. That would be a different case. I'm sorry. I see that I'm out of time. If there's no further questions. Judge Murphy? I have no questions. Okay. Thank you. I'll ask the court to affirm. Unless there are any further questions, I will rest on the briefs. Thank you. Thank you. Then we will take this matter under advisement. Thank you for your argument today. Thank you.